The STATE of Ohio, Appellee,

v.

AYERS, Appellant.

[Cite as *State v. Ayers,* 185 Ohio App.3d 168, 2009-Ohio-6096.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 91847.

Decided Nov. 19, 2009.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Mary McGrath, Assistant Prosecuting Attorney; and Nancy Hardin Rogers, Attorney General, for appellee.

Ohio Innocence Project, Mark A. Godsey, and David M. Laing, for appellant.

MELODY J. STEWART, Judge.

{¶ 1} Appellant, David Ayers, appeals from a Cuyahoga County Court of Common Pleas order denying his second application for deoxyribonucleic acid ("DNA") testing pursuant to R.C. 2953.71 et seq. Ayers presents two assignments of error challenging the trial court's finding that his application for DNA testing is barred by res judicata and further fails to meet the statutory require-

ments for acceptance. Finding merit to the assigned errors, we reverse the decision of the trial court.

{¶ 2} In 2000, a jury convicted Ayers of aggravated murder, aggravated robbery, and aggravated burglary of an elderly woman who lived in the same apartment building as Ayers. The evidence offered at trial showed that the victim had been beaten and was found in her apartment nude from the waist down. Although investigators found pubic hairs in the victim's mouth, they determined that there was no evidence of any sexual assault. The pubic hairs were of undetermined origin, with both the victim and Ayers being excluded as the source of the hair. The victim's body showed signs that she had tried to defend herself, but fingernail scrapings did not yield any biological evidence. On appeal, a highly divided panel of this court affirmed the convictions but remanded the case for resentencing in accordance with the statutes in effect at the time. *State v. Ayers*, Cuyahoga App. No. 79134, 2002-Ohio-4773, 2002 WL 31031675.

{¶ 3} On November 3, 2004, Ayers, proceeding pro se, filed his first application for DNA testing of pubic hair and biological material found on the victim. At trial, Ayers had vigorously challenged the state's identification of him as the perpetrator; he told the court that DNA testing of the biological material obtained from the victim would rule him out as the source of the DNA. The trial court denied the application, finding that Ayers failed to demonstrate that DNA testing would be "outcome determinative" as defined by R.C. 2953.71(L). This decision was reversed on appeal based upon the determination that the trial court's explanation for the denial of the application was statutorily insufficient and that the trial court failed to order the state to prepare and file a DNA evidence report as required by R.C. 2953.75. *State v. Ayers*, Cuyahoga App. No. 86006, 2005-Ohio-6972, 2005 WL 3549183.

{¶ 4} The state appealed that decision to the Supreme Court of Ohio, where it was reversed on the authority of *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, 863 N.E.2d 124. See *State v. Ayers*, 113 Ohio St.3d 180, 2007-Ohio-1385, 863 N.E.2d 598. In *Buehler*, the Supreme Court addressed the statutory requirements for postconviction DNA testing and determined that "a trial court should exercise its discretion * * * as to whether it will first determine whether the eligible inmate has demonstrated that the DNA testing would be outcome determinative or whether it should order the prosecuting attorney to prepare and file a DNA evidence report." Id. at paragraph two of the syllabus.

{¶ 5} This court thereafter remanded the case to the trial court for further explanation of its reasons for denying Ayers's application. *State v. Ayers*, Cuyahoga App. No. 86006, 2007-Ohio-5939, 2007 WL 3286905. On remand, the trial court supported its denial of the application with an opinion addressing the items Ayers sought to have tested: blood, pubic hairs, and skin from under the

victim's fingernails. The court noted that trial testimony from Curtiss Jones of the Cuyahoga County Coroner's Office Trace Evidence Department established that testing of the pubic hairs and blood collected from the victim as trace evidence showed that they could not be linked to Ayers. The court also found that there was no evidence that any biological material had been found under the victim's fingernails (only fibers were found under the fingernails), so it had no "parent sample" available for testing. This decision was affirmed on appeal. *State v. Ayers*, Cuyahoga App. No. 90907, 2008-Ohio-5475, 2008 WL 4681512, appeal not accepted, *State v. Ayers*, 121 Ohio St.3d 1440, 2009-Ohio-1638, 903 N.E.2d 1223.

{¶ 6} On February 27, 2008, while the second appeal of the denial of his application for DNA testing was pending, Ayers filed a second application for DNA testing of "fingernail scrapings, hairs, [and] pubic hairs." Challenging the state's evidence that the victim had not been sexually assaulted and that the police did not adequately investigate an alternate suspect, Ayers urged the court to grant his second application on grounds that advances in DNA testing technology would now reveal DNA when older, less-sophisticated DNA testing methods had detected none. He also noted that a change in the statutory definition of "outcome determinative" would leave no question that subsequent DNA testing of the items from the crime scene would prove him innocent of the crimes for which he was convicted.

{¶ 7} The trial court denied Ayers's application for DNA testing, finding that it was barred by res judicata. The court stated it had already held that DNA testing of the identical items would not be outcome determinative and further that a required parent sample from the fingernail scrapings did not exist.

{¶ 8} The court explained that the statutes require a "parent sample"—the biological material first obtained from a crime scene or victim—in order to grant an application for DNA testing. And because there had been a determination that "only fibers" were present in the fingernail scrapings, the court found that no parent sample existed for testing. The court further explained that the jury heard Curtiss Jones testify that no items, including blood and hair collected from the victim and crime scene, linked Ayers to the crimes. The court stated, "The jury that convicted Ayers, therefore, was aware that he was not the source of the hair and blood recovered from the victim and crime scene. * * * Ayers's application, therefore, fails to demonstrate DNA testing would be outcome determinative and cannot be accepted."

{¶ 9} Ayers challenges the trial court's decision, raising two errors for our review.

{¶ 10} "I. The trial court erred in holding that res judicata barred appellant's Senate Bill 262 application for DNA testing because the trial court's prior decision was denied under a different standard."

{¶ 11} "II. The trial court erred in ruling that testing would not be outcome determinative because testing would establish that someone else committed the murder for which appellant was convicted."

## I

{¶ 12} The trial court "has discretion on a case-by-case basis" to accept or reject an eligible inmate's application for DNA testing. R.C. 2953.74(A). We therefore review the trial court's decision for abuse of discretion.

{¶ 13} An abuse of discretion means more than an error of law or judgment. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 14} Ayers bases his appeal on the fact that R.C. 2953.74, which provides the standard under which a trial court may accept an application for postconviction DNA testing, was revised in 2006 to provide a more lenient standard for granting DNA testing. He claims that under the more lenient standard, he is entitled to DNA testing. Additionally, Ayers argues that the trial court erred in applying the principles of res judicata to this case and that the failure to apply the standard of the amended statute to his subsequent petition denies him due process.

## II

{¶ 15} Res judicata involves the related concepts of claim preclusion and issue preclusion, also known as collateral estoppel. *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 653 N.E.2d 226. As relevant here, "issue preclusion * * * serves to prevent relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action." *O'Nesti v. DeBartolo Realty Corp.*, 113 Ohio St.3d 59, 2007-Ohio-1102, 862 N.E.2d 803, ¶ 7. See also *State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 174 Ohio App.3d 135, 2007-Ohio-6594, 881 N.E.2d 294 (holding that "issue preclusion precludes relitigation of an issue that has been actually and necessarily litigated and determined in a prior action").

{¶ 16} The doctrine of res judicata is applicable to petitions for postconviction relief. *State v. Perry* (1967), 10 Ohio St.2d 175, 39 O.O.2d 189, 226 N.E.2d 104. Courts have held that when a defendant unsuccessfully raises a claim in a postconviction petition, res judicata precludes the defendant from raising the

same claim in a subsequent postconviction petition. *State v. Castro* (1979), 67 Ohio App.2d 20, 21 O.O.3d 338, 425 N.E.2d 907; *State v. Frye* (Nov. 10, 1997), Franklin App. No. 97APA01–106, 1997 WL 710546. It is well established that the application of res judicata is mandatory, even if there is a subsequent change in the law by judicial decision. See *State v. Szefcyk* (1996), 77 Ohio St.3d 93, 95, 671 N.E.2d 233. It is less clear, however, whether principles of res judicata apply to statutory changes in the law.

{¶ 17} In *Natl. Amusements, Inc. v. Springdale* (1990), 53 Ohio St.3d 60, 62–63, 558 N.E.2d 1178, the Ohio Supreme Court stated:

{¶ 18} "Because a strict application of res judicata might frustrate other objectives of the legal system, 'a series of exceptions have evolved to accommodate what are deemed to be these more important policies. However, it is important to note that although a number of cases may speak in terms of allowing an exception as being in the "public interest" or because it avoids "injustice," these generally are overstatements. * * * [E]xceptions to res judicata most commonly and properly are invoked only in specialized situations in which a specific policy is deemed to outweigh judicial economy concerns.' (Footnotes omitted.) Friedenthal, Kane & Miller, Civil Procedure (1985) 656, Section 14.8. For example, habeas corpus actions are exempt from res judicata because '[c]onventional notions of finality of litigation have no place where life or liberty is at stake * * *.' *Sanders v. United States* (1963), 373 U.S. 1, 8, 83 S.Ct. 1068, 1073, 10 L.Ed.2d 148."

{¶ 19} In 2006, the General Assembly amended Ohio's DNA testing statutes. The amendments, among other things, made postconviction DNA testing more available to inmates and lowered the outcome-determinative standard for establishing entitlement to DNA testing. Under the prior version of R.C. 2953.71(L), "outcome determinative" meant that had "the results of DNA testing been presented at the trial * * * and been found relevant and admissible with respect to the felony offense for which the inmate * * * is requesting the DNA testing * * * no reasonable factfinder would have found the inmate guilty of that offense."

{¶ 20} Under the amended statute, " 'outcome determinative' means that had the results of DNA testing of the subject inmate been presented at the trial * * * and been found relevant and admissible with respect to the felony offense for which the inmate * * * is requesting the DNA testing * * *, *and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case * * *, there is a strong probability* that no reasonable factfinder would have found the inmate guilty of that offense." (Emphasis added.) R.C. 2953.71(L).

{¶ 21} The addition of the words "strong probability," among others, in the current version of R.C. 2953.71(L), in essence lowers the definition of "outcome determinative" from a showing of innocence beyond a reasonable doubt to one of clear and convincing evidence.

{¶ 22} Although there is no legislative statement of intent in the amended R.C. 2953.71(L), there can be no doubt that the rise of DNA testing as an investigative tool prompted the General Assembly to lower the statutory standard for what constitutes "outcome determinative." The United States Department of Justice, Office of Justice Programs, has recognized that "DNA technology has become one of the most powerful tools to ensure that justice is done through our criminal justice system. It helps identify offenders and eliminate innocent suspects. Increasingly, DNA is also used to exonerate the wrongly convicted." See Ritter, Postconviction DNA Testing Is at Core of Major NIJ Initiatives (Mar.2009), National Institute of Justice Journal, No. 262.[1] And the United States Supreme Court recently stated in *Dist. Attorney's Office v. Osborne* (2009), —— U.S. ——, ——, 129 S.Ct. 2308, 2316, 174 L.Ed.2d 38:

{¶ 23} "Modern DNA testing can provide powerful new evidence unlike any-thing known before. Since its first use in criminal investigations in the mid–1980s, there have been several major advances in DNA technology, culminating in STR technology. It is now often possible to determine whether a biological tissue matches a suspect with near certainty. While of course many criminal trials proceed without any forensic and scientific testing at all, there is no technology comparable to DNA testing for matching tissues when such evidence is at issue. DNA testing has exonerated wrongly convicted people, and has confirmed the convictions of many others." (Citations omitted.)

{¶ 24} The United States Supreme Court has stated that the "ultimate objective" of our system of criminal law is that "the guilty be convicted and the innocent go free." *Herring v. New York* (1975), 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593. If DNA testing has the proven ability to "exonerate[ ] wrongly convicted people," we can perceive no viable argument that matters of judicial economy should supersede the law's never-ending quest to ensure that no innocent person be convicted. The refinement of DNA testing has shown that law and science are intersecting with increasing regularity. When scientific advances give the courts the tools to ensure that the innocent can go free, those advances in science will necessarily dictate changes in the law. See, e.g., *Pickett v. Brown* (1983), 462 U.S. 1, 17, 103 S.Ct. 2199, 76 L.Ed.2d 372, fn. 6 (noting that "recent advances" in blood testing have dramatically reduced the possibility of false paternity claims).

---

1. *http://www.ojp.usdoj.gov/nij/journals/262/postconviction.htm* (last accessed Oct. 30, 2009).

{¶ 25} The Ohio General Assembly has plainly embraced this notion by lowering the standard required to show that DNA testing can be outcome determinative. Given the efficacy of DNA testing as an investigative tool in criminal cases, we conclude for purposes of res judicata that DNA testing is a "specialized situation" in which the fear of wrongful conviction outweighs any judicial economy concerns.

{¶ 26} Nothing that we have said is meant to suggest that convicted defendants are entitled to additional DNA testing based on nothing more than the passage of time and the assumption that science has developed more refined testing methods. We have made it clear that the courts must consider such motions on a case-by-case basis and those motions must make a threshold showing that DNA testing could be outcome determinative. If that showing is made, res judicata will not bar testing even though an earlier application for DNA testing was denied. Because Ayers's first application was considered and rejected under the earlier, more restrictive statute, we find that principles of res judicata are inapplicable to preclude consideration of this petition. Accordingly, appellant's first assignment of error is sustained.

### III

{¶ 27} In his second assignment of error, Ayers argues that the trial court erred by denying his petition for DNA testing on the basis that testing would not be outcome determinative. Ayers asserts further that testing would establish that someone else murdered the victim.

{¶ 28} "The trial court may 'accept' an eligible inmate's application for DNA testing only if the following factors are present: (1) biological material was collected from the crime scene of the victim(s), and the parent sample of that biological material still exists; (2) the parent sample of the biological material is sufficient, demonstrably uncorrupted, and scientifically suitable for testing; (3) the identity of the perpetrator of the charged offense was an issue at the inmate's trial; (4) a defense theory at trial was such that it would permit a conclusion that an 'exclusion result would be outcome determinative;' and (5) 'if DNA testing is conducted and an exclusion result is obtained, the results of the testing would be outcome determinative.' See R.C. 2953.74(B) and (C)." *State v. Emerick*, 170 Ohio App.3d 647, 2007-Ohio-1334, 868 N.E.2d 742, ¶ 15.

{¶ 29} The identity of the victim's murderer was at issue in Ayers's trial. He continues to profess his innocence and no physical evidence found at the apartment or on the victim's body linked Ayers to the crimes.

{¶ 30} The trial court determined that a parent sample from the victim's fingernail scrapings did not exist because no biological material was found—"only

fibers." This conclusion, however, was based on a microscopic examination with no DNA testing conducted. As Ayers notes, particular DNA tests that are available now were unavailable at the time of his trial. Technological improvements in testing could lead to results that are outcome determinative under the amended statute. Id.

{¶ 31} R.C. 2953.74(E) provides: "If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code and the court accepts the application, the eligible inmate may request the court to order, or the court on its own initiative may order, the bureau of criminal identification and investigation to compare the results of DNA testing of biological material from an unidentified person other than the inmate that was obtained from the crime scene or from a victim of the offense for which the inmate has been approved for DNA testing to the combined DNA index system maintained by the federal bureau of investigation."

{¶ 32} Ayers contends that the trial court erred in denying his application because DNA testing of all of the evidence collected at the scene would "prove that he was not the donor of biological material that is intimately tied to the crime for which he was convicted." He argues that if a DNA profile of an unidentified person is obtained from the pubic hairs found in the victim's mouth, on her dentures, and on one of her footies, and that profile matches DNA found on other evidence collected at the scene, then a strong inference would be raised that the profile was that of the true assailant.

{¶ 33} The state counters this contention by noting that the jury convicting Ayers was informed that none of the items Ayers seeks to have DNA tested linked him to the crimes. The state argues further that (1) since the jury was told Ayers was excluded as a source of the biological material collected at the crime scene, (2) this knowledge was considered by the jury, and (3) the jury still convicted him, the change in the "outcome determinative" standard is meaningless. We disagree.

{¶ 34} As previously noted, "outcome determinative" under the current statute not only establishes a lower standard for determining whether a reasonable fact-finder would have found guilt, but provides also for analyzing DNA test results "in the context of and upon consideration of all available admissible evidence related to the inmate's case." R.C. 2953.71(L). This additional language seems to make clear that an exclusion result is not the only factor to consider when deciding whether DNA testing will be outcome determinative. In addition to the amendments in R.C. 2953.71(L), other amendments to the statutes recognize the advances in DNA testing and provide inmates the avenue to access the Combined DNA Index System ("CODIS").

{¶ 35} In *State v. Reynolds*, Montgomery App. No. 23163, 2009-Ohio-5532, 2009 WL 3353591, the Second District reversed a trial court decision that denied Reynolds's application for postconviction DNA testing. Reynolds had been convicted by a jury of aggravated robbery and felonious assault in 2001, and his convictions were affirmed on appeal. See *State v. Reynolds*, Montgomery App. No. 19083, 2002-Ohio-5594, 2002 WL 31341558. Similar to the facts in this appeal, no physical evidence recovered from the crime scene was linked to Reynolds.

{¶ 36} In overruling Reynolds's application for DNA testing, the trial court held that any testing of the evidence would not be outcome determinative of Reynolds's innocence. *Reynolds*, 2009-Ohio-5532, 2009 WL 3353591, at ¶ 8. Reversing the trial court, the Second District recognized the advances in DNA testing and further made note of Reynolds's ability to utilize CODIS if allowed to conduct testing of the biological material. More importantly, the court agreed with Reynolds "that the absence of his DNA and the simultaneous presence of a known felon's DNA from CODIS would create a strong probability of a different outcome in the instant case." Id. at ¶ 22.

{¶ 37} The amendments to the DNA statutes and the decision in *Reynolds* recognize the fact that in some cases, merely being excluded from a crime scene is insufficient to convince a court that the requested postconviction relief is warranted. In Ohio, the most noted example of this premise is the conviction of Clarence Elkins, *State v. Elkins* (Sept. 27, 2000), Summit App. No. 19684, 2000 WL 1420285, who was subsequently exonerated.[2] See also *State v. Houston,*

---

2. {¶ a} In 1999, Clarence Elkins was convicted of murder, attempted aggravated murder, rape, and felonious assault and was sentenced to life in prison. The victims of the crimes were his mother-in-law and niece. There was little circumstantial evidence linking Elkins to the crimes, and DNA testing available at the time of pubic hairs found on the victims excluded Elkins as a possible contributor. See Innocence Project, Know the Cases, http://www. innocenceproject.org/Content/92.php (last accessed Oct. 22, 2009). The only direct evidence presented at trial was his then six-year-old niece's testimony identifying Elkins as the assailant.

{¶ b} Three years after the conviction, the niece recanted her testimony stating that the assailant looked like Elkins but had different eyes. A videotaped deposition of the recantation was the basis for a request by Elkins for postconviction relief. The request was denied by the trial court without hearing and affirmed on appeal. *State v. Elkins*, Summit App. No. 21380, 2003-Ohio-4522, 2003 WL 22015409. Also, in 2002, Elkins petitioned the court for a new trial and an order requiring the state to pay for DNA testing of the biological evidence recovered from the crime scene in light of advances in DNA testing technology. See *State v. Elkins* (Dec. 9, 2002), Summit C.P. No. CR 1998–06–1415. The court denied these requests on grounds that the results would not prove Elkins's innocence. Elkins's wife thereafter raised the funds to pay for DNA testing. In addition to again excluding Elkins as a possible contributor of the biological evidence, the test results revealed a third person's DNA—a male profile—on key pieces of evidence. Moyer & Anway, Biotechnology and the Bar: A Response

Cuyahoga App. No. 90780, 2009-Ohio-224, 2009 WL 147404 (after several attempts to secure a new trial on grounds that the sole eyewitness to the crime recanted his identification of Houston as the perpetrator and claimed to know the actual perpetrator of the crime, only when another individual was actually identified did the court grant a new trial).

{¶ 38} The *Elkins* and *Houston* cases demonstrate the monumental obstacles those who profess to be wrongfully convicted must hurdle when attempting to prove their innocence. In both cases, evidence in support of innocence was insufficient to secure release from prison. Only when the actual perpetrator of the crime in *Elkins* was identified did Elkins obtain relief—namely, exoneration. In *Houston,* only when a third person was identified as the perpetrator did Houston obtain his requested relief—namely, a new trial.

{¶ 39} The amendments to the DNA testing statutes recognize the inherent difficulties involved in trying to prove one's innocence after having been convicted. The statutes are less restrictive now and do more than simply allow an eligible inmate to petition for DNA testing in order to obtain an exclusion result.

{¶ 40} Also worth noting is the fact that additional testing may not yield an inmate's expected results. In other words, testing can cut both ways for an applicant. Testing may indeed lead to the exoneration of one wrongfully convicted but can also further implicate the inmate or simply have a neutral effect.

{¶ 41} As a case in point, the results of DNA testing proved unavailing for Gerald Robinson, a priest who was convicted in 2006 for the 1980 murder of Sister Margaret Ann Pahl. See *State v. Robinson,* Lucas App. No. L–06–1182, 2008-Ohio-3498, 2008 WL 2700002. Counsel for Robinson pointed to another priest who they believed to be the actual perpetrator of the crime. However, the male DNA found on the victim's body did not match the man whom Robinson asserted was the murderer. In response to the test results and confident in the verdict reached in Robinson's trial, a prosecutor from Lucas county was quoted in a local newspaper as saying, "[W]e are not at all surprised at this result. We

---

to the Growing Divide Between Science and the Legal Environment (2007), 22 Berk. Tech. L.J. 671, 688, fn. 91.

{¶ c} Elkins moved again for a new trial, which the trial court denied in 2005. Elkins filed a notice of appeal and while the appeal was pending, it was discovered that the DNA profile of the third person matched that of someone who was incarcerated for sexual offenses and who had lived near the mother-in-law's home (the crime scene) when the crimes were committed. With the support of the Ohio Attorney General, Elkins sought a remand to the trial court to consider the evidence. The request was denied.

{¶ d} After receiving yet another DNA report linking the incarcerated individual to the crimes, the county prosecutor asked the court to dismiss all charges against Elkins, vacate his conviction, and immediately release him from prison. Elkins had been incarcerated for six and a half years. In 2008, the "third person," Earl Mann, pleaded guilty to committing the crimes.

proved in court who Sister Pahl's killer was, and the defendant is welcome to spend all the money he wants doing additional DNA testing because it won't change anything." Yonke, New DNA tests setback for priest in nun's slaying; material is not from source suggested by defense, Toledo Blade (July 16, 2009).[3]

{¶ 42} Applications for DNA testing are reviewed on a case-by-case basis depending on the unique facts of each case. Ayers makes a compelling argument in support of the DNA testing he seeks. The police found biological evidence on the victim. Although none of this evidence matched Ayers's DNA profile, it is possible that refinements in testing could identify the source of the DNA and perhaps establish proof that another person had been in the victim's apartment at the time of the murder. Importantly, these more sensitive tests could show the existence of biological material under the victim's fingernails when testing conducted nearly ten years ago could not. Given evidence that the victim had wounds that indicated she tried to defend herself, a positive identification of such material would likely point to the murderer.

{¶ 43} Ayers is bearing the cost of DNA testing through nonpublic means, so testing will not financially burden the state. And if the DNA testing of the items Ayers seeks to have tested yields his expected results, that is, establishing a profile of someone who is inextricably linked to the crimes and subsequently identified—such results would undermine the confidence in the jury's verdict. Under these circumstances, we find that the trial court abused its discretion by denying Ayers's application for DNA testing.

{¶ 44} This cause is reversed and remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

KILBANE, P.J., and McMONAGLE, J., concur.

---

3. http://www.toledoblade.com/apps/pbcs.dll/article?AID=/20090716/NEWS02/907160313 (last accessed Sept. 25, 2009).