[Cite as *State v. Andrews*, 2019-Ohio-1771.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 107357 |
| v. | : | |
| ISIAH ANDREWS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** May 9, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-75-017902-ZA

*Appearances:*

Brian Howe, Mark A. Godsey, and Mallorie Thomas, The
Ohio Innocence Project, *for appellant*.

Michael C. O'Malley, Prosecuting Attorney, and Anthony
Thomas Miranda, Assistant Prosecuting Attorney, *for
appellee*.

LARRY A. JONES, SR., J.:

{¶ 1} Defendant-appellant Isiah Andrews ("Andrews") appeals the trial court's denial of his application for DNA testing. For the following reasons, we reverse and remand.

**{¶ 2}** In 1975, Andrews was convicted in the aggravated murder of his wife, Regina Andrews ("Regina"). He was sentenced to life in prison. His conviction was affirmed on appeal. *State v. Andrews*, 8th Dist. Cuyahoga No. 34620, 1976 Ohio App. LEXIS 7602 (Mar. 18, 1976). He has been in prison since 1975 and is currently 81 years old.

**{¶ 3}** The following facts were adduced at trial, as stated in *Andrews* at 1-3:

The defendant was arrested on September 19, 1974 and charged with the stabbing death of his wife, Regina Andrews. At trial Linda Cloud testified that she lived in the Colonial Hotel next door to where the defendant and his wife lived. Cloud stated that on September 17, 1974 at 9:00 p.m. she saw Regina Andrews and an unidentified man enter the Andrews'[s] room and that sometime later she saw the defendant appear and also enter the room. Cloud testified that between 1:00 and 1:30 on the morning of September 18, she saw the defendant and his wife leave their room and get into their car, at which time she overheard the defendant tell his wife, "[B***], you know I am going to kill you, don't you."

Betty Worth[1] testified that she was working as a maid at the Colonial House Hotel on September 18, 1974 when, at about 11:00 a.m., she saw the defendant talking to his wife in the doorway of their room. Worth stated that she saw the defendant slam the door and go inside the room, whereupon a record player in the room was turned up very loud. Worth stated that approximately ten minutes later the record player was turned off and the defendant came out of his room, went to his car and opened its trunk; that the defendant then returned to his room and within a few minutes left carrying a large heavy object over his shoulder which he placed in the trunk of his car. Worth testified that she walked past the defendant's room and saw that the bed was stripped of all linen.

Regina Andrews's body was found in Forest Hills Park in the afternoon of September 18, 1974 wrapped in bedroom linen. The linen

---

[1]Although the witness is referred to as "Betty Worth," a review of the transcript shows that her last name was actually "Worthy."

was identified by Betty Worth as being the same type used in the Colonial House Hotel.

{¶ 4} The following facts were also adduced at trial, based on our review of the trial transcript:

{¶ 5} Andrews and his wife were temporarily living in Room 133 at the Colonial House Motel. Around 5:00 p.m. on September 18, 1974, Andrews spoke to Betty Worthy, an unpaid maid at the motel, and inquired about his wife's whereabouts. Worthy knew that several prostitutes lived at the motel and suggested that maybe Regina had been arrested. Andrews called police and reported his wife missing. After a few hours, Andrews called his wife's mother. After receiving a phone call from Andrews, Regina's mother arrived at the motel with some family members. They noted that other than dirty dishes in the kitchenette, the room was neat and orderly, the bed was made, and there was no blood anywhere. Andrews told his mother-in-law that he was away from the motel most of the day and he did not know where Regina was.

{¶ 6} Regina's body was discovered by a bystander, Jesse Byous, who found her in Forest Hills Park, wrapped in blood-soaked bed linens. She had multiple stab wounds to her neck and the front of her body. Regina's nightgown, peignoir, and full-length caftan were pushed up above her waist, leaving her lower half bare. Regina was not wearing any underwear or shoes. The bed sheets found with the victim were labeled "Holiday Inn, Akron-Canton." Police also discovered two pillow cases labeled "Howard Johnson" and a hand towel stained with urine and fecal

matter in the bedding. Police found about a dozen blood-soaked Plain Dealer newspapers in the woods near the body.

{¶ 7} On September 19, detectives went to the Colonial Inn, where Andrews voluntarily agreed to speak with them. Andrews explained that the couple had recently married and were staying at the motel temporarily while searching for a place to live. Andrews told police he last had sexual intercourse with his wife the night before she was killed. He last saw his wife when he left their room just before 8:00 a.m. on the morning of September 18. He ran errands over the course of the day, selling clothes and wholesale fish, and returned home in the afternoon. When he got back to the motel, the room was locked with no one inside, and Andrews had to get a spare key from the front desk clerk.

{¶ 8} After meeting with Andrews, detectives interviewed others at the motel, including Linda Cloud and Betty Worthy. Cloud lived next door to the Andrews in Room 131. She initially told detectives that she saw Andrews and Regina on September 17 and heard the TV on around 11:00 a.m. on September 18. Cloud also told police that a light-skinned man was in the Andrews's motel room around 9:00 p.m. on September 17.

{¶ 9} Betty Worthy had lived at the Colonial House Motel for two months. Worthy told police that she saw Andrews talking to his wife around 11:00 a.m. on September 18. According to Worthy, Andrews was inside the room for approximately ten minutes and, during that time, extremely loud music was playing. Andrews then came out of his motel room and made eye contact with Worthy. He

walked to his car, opened the trunk, and proceeded back to his room. When he emerged from his room again, Worthy saw Andrews carrying a heavy bag over his shoulder, which he put in the trunk. He then returned to the doorway of the motel room, said some words into the room, and left.

{¶ 10} Worthy next saw Andrews around 5:00 p.m. at the motel office. Worthy testified that Andrews was still wearing the same brown suit she had seen him in earlier in the day and he was dressed "very neatly," as he usually dressed. At trial, Worthy told, for the first time, that after she saw Andrews put a bag in the car, she looked into the Andrews's room and saw that the sheets had been stripped off the bed. Worthy admitted that she did not mention this to police in her initial account. According to Worthy, she "only told [police] part of it" and could not initially remember details to which she eventually testified.

{¶ 11} Dr. Elizabeth Balraj performed the autopsy on Regina. She counted 11 stab wounds, all to the front of the body – the doctor located 7 stab wounds on the neck and 4 superficial stab wounds on the abdomen. Dr. Balraj estimated that Regina lost two to three pints of blood and testified that the stabbing would have produced "a great deal of blood."

{¶ 12} Andrews gave police permission to search his car, including the trunk, but the police did not locate any blood in the car or its trunk. The police also did not locate any blood in the Andrews's motel room, including on the mattress or the carpet.

{¶ 13} As part of the investigation, police closely examined the Regina's clothing for defects, where the knife would have penetrated the fabric. Despite Regina having been stabbed 11 times in the neck and abdomen, there were no defects on the peignoir, and her full-length caftan showed only two defects, both around the neck area. Barbara Campbell, a trace evidence technician with the coroner's officer, testified that the markings on Regina's clothes were consistent with her nightclothes having been "pushed up" at the time of stabbing.

{¶ 14} The coroner's office also collected swabs from Regina's vagina, rectum, and mouth and discovered intact, fully-tailed sperm on the vaginal swabs. At trial, Dr. Balraj testified that these swabs were collected to investigate a potential sexual assault:

> Q: Doctor, may I ask you why you performed the test on these three openings [vaginal, anal, and oral]?
>
> A: To look for sperm.
>
> Q: Why look for sperm?
>
> A: To look if there has been any recent sexual intercourse.
>
> Q: And is this, in part, due to the determination or to make a better determination as to whether or not there was any sexual assault involved in this killing?
>
> A: That is correct.
>
> Q: All right. When we talk about sexual assault, we are talking about rapes and things of that sort, aren't we?
>
> A: Yes, that is correct.

**{¶ 15}** DNA testing was not available in 1974, thus the sperm was never tested for a DNA match. Despite the fact that blood type testing was available in 1974, the coroner's office never tested the sperm for blood type.

**{¶ 16}** The jury convicted Andrews of aggravated murder and the court sentenced him to life in prison.

**{¶ 17}** In April 2018, Andrews filed an application for DNA testing, requesting the testing of vaginal swabs collected from the victim during the autopsy. In his motion, he argued that the trial court had multiple sources of authority under which it could order DNA testing: (1) the Ohio postconviction DNA testing statutes, R.C. 2953.71 et seq.; (2) R.C. 2933.82 which requires the testing of sexual assault examination kits; and (3) a trial court's equitable authority. Plaintiff-appellee, the state of Ohio, filed a report confirming that the Cuyahoga County Medical Examiner was in possession of three sets of oral, vaginal, and rectal slides. But the state opposed Andrews's request for DNA testing, arguing that the test results would not alter the outcome of the trial, the slides were not part of a sexual assault examination kit, and the trial court had only statutory authority to order testing.

**{¶ 18}** The trial court denied Andrews's application. In its opinion, the trial court noted that there was no evidence presented at trial that Regina's sexual activity was related to her murder and concluded that "there is no strong probability that a reasonable factfinder would not find Defendant guilty based upon any DNA testing regardless of the results."

{¶ 19} This appeal followed. Andrews raises two assignments of error for our review:

I. The trial court erred by denying appellant access to DNA testing pursuant to R.C. 2953.71 – 81.

II. The trial court erred by implicitly denying appellant's request for DNA testing under R.C. 2953.84 without explaining its reasoning.

{¶ 20} In his first assignment of error, Andrews claims that the trial court erred by denying his access to DNA testing pursuant to R.C. 2953.71 et seq.

{¶ 21} Advances in DNA testing prompted the General Assembly to enact R.C. 2953.71 et seq. in 2003. These statutes permit an eligible prison inmate who has been convicted of a felony and who has at least a year remaining on his or her prison term to file a postconviction application for DNA testing of biological evidence upon which no DNA test, or an inconclusive DNA test, has been conducted. *See* R.C. 2953.71(F), 2953.72(A) and (C), and 2953.74(A) and (B). The court may accept an eligible inmate's DNA-testing application only if (1) biological material was collected from the crime scene or the victim, and the parent sample of that biological material still exists; (2) the parent sample of the biological material is sufficient, demonstrably uncorrupted, and scientifically suitable for testing; (3) the identity of the perpetrator of the charged offense was an issue at the inmate's trial; (4) a defense theory at trial was such that it would permit a conclusion that an "exclusion result w[ould] be outcome determinative"; and (5) "if DNA testing is conducted and an exclusion result is obtained, the results of the testing w[ould] be outcome determinative." *See* R.C. 2953.74(B) and (C).

**{¶ 22}** An "exclusion result" is a DNA test result "that scientifically precludes or forecloses the * * * inmate as a contributor of biological material recovered from the crime scene or victim in question." R.C. 2953.71(G). Importantly, an exclusion result is "outcome determinative" if,

> had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in division (D) of section 2953.74 of the Revised Code, there is a *strong probability* that no reasonable factfinder would have found the offender guilty of that offense * * * .

(Emphasis added.) R.C. 2953.71(L).[2]

**{¶ 23}** In deciding whether to accept an application for DNA testing, the trial court "shall consider the application, the supporting affidavits, and the documentary evidence and, in addition to those materials, shall consider all the files and records pertaining to the proceedings against the applicant, including, but not limited to * * * the court reporter's transcript." R.C. 2953.73(D).

**{¶ 24}** R.C. 2953.74(A) provides that the common pleas court "has discretion on a case-by-case basis" to accept or reject an eligible inmate's application for DNA testing. Thus, we review a trial court's decision whether to grant the application for an abuse of discretion. An abuse of discretion is more than an error

---

[2]In 2006, the General Assembly amended R.C. 2953.71(L) to lower the outcome determinative standard for establishing entitlement to DNA testing. The current version lowered the definition of "outcome determinative" from a "showing of innocence beyond a reasonable doubt to one of clear and convincing evidence." *State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, ¶ 21 (8th Dist.).

of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 25} In this case, the trial court found that DNA testing would not be outcome determinative because, "[t]he simple fact that Regina had sex with someone prior to her death is not enough without other evidence to suggest there was some other perpetrator." The trial court also focused on the parties' arguments at trial, stating that "[n]either the State nor the defense relied upon anything relating to sexual activity or sexual assault in this case," and that "no defense was presented that Regina had been sexually assaulted and that whoever had assaulted her was that murderer."

{¶ 26} Although the closing arguments from the trial do not appear to have been transcribed, defense counsel did question witnesses about the theory that Regina was sexually assaulted before she was killed. During defense counsel's cross-examination of Barbara Campbell, a trace evidence technician with the coroner's office, defense counsel asked: "So, is it not possible that given the facts that there is sperm in the vagina and given the fact that the caftan which was over this woman's bed or nightclothing, is it not possible that that was pushed up just prior to death and that she was sexually assaulted?" (The state objected to the question and the trial court sustained the objection.) Defense counsel also solicited testimony from the coroner, Dr. Balraj, that she collected the vaginal, oral, and anal swabs to determine whether a sexual assault had occurred. Thus, one could reasonably

conclude that the defense theory was that whomever killed Regina did so in the course of some kind of sexual activity or assault.

{¶ 27} There was also objective evidence linking Regina's murder to sexual activity. At the time of her death, Regina was wearing a nightgown and peignoir under a full-length caftan. Both the nightgown and the caftan appear to have been pushed up around the time Regina was stabbed. Although the state claimed that Regina was killed in her motel room and the nightgown was pushed up when Andrews transported her from the motel to the woods, the state's own forensic witness, Barbara Campbell, testified that the slash marks through Regina's nightgown were consistent with it having been folded and bunched up around her upper abdomen when the knife passed through the fabric. Further, although Regina was stabbed in the abdomen multiple times, the peignoir had no slash type defects at all and the full-length caftan had only two slash defects, both around the neck and both corresponding to stab wounds on Regina's neck. Thus, Andrews argues, the perpetrator could not have stabbed Regina multiple times in the abdomen without leaving any corresponding defects in the caftan, unless Regina's clothing was pushed up at the time of the murder. This evidence, Andrews claims, strongly indicates that the murder was connected to some form of sexual activity.

{¶ 28} The victim was found lying on or near a small towel, without underwear. During the autopsy, the coroner noted the presence of fully-tailed sperm. Dr. Balraj testified that she could not determine how long ago the sperm had been deposited, except that it "could have been hours." Campbell testified that the

sperm found in the victim were immobile or dead, and, although she could not opine as to when the victim last had sexual intercourse, she had seen mobile sperm up to days ("152 hours") after deposit.

{¶ 29} The trial court noted in its opinion denying Andrews's application that the state did not present any evidence related to sexual assault and did not charge Andrews with any crimes of sexual violence. In 1974, however, it was not a crime to commit an act of sexual violence against your spouse. *See* former R.C. 2907.02-.06.

{¶ 30} In light of the above, we agree with Andrews that determining the source of the sperm found in Regina is critical. The outcome determinative standard requires the court to assume that DNA testing will lead to an exclusion result, i.e., that DNA testing will prove that the sperm found on the vaginal swabs came from someone other than Andrews. *See* R.C. 2953.74(B)(1); R.C. 2953.71(G). It also requires courts to consider this exclusion "in the context of and upon consideration of all available admissible evidence." R.C. 2953.74(B)(1); R.C. 2953.71(L).

{¶ 31} Andrews admits that it is possible that his wife was found with her clothes bunched up around her upper abdomen for reasons unrelated to sexual activity. He also concedes that it is possible that the fully-tailed sperm may be on the vaginal swabs for reasons unconnected to his wife's murder or sexual assault, e.g., she had consensual sexual intercourse with someone other than Andrews prior to her murder. And, as mentioned, Andrews told police he and his wife had sexual intercourse the day before she was killed. However, it is equally possible that Regina

was stabbed as a part of, or immediately following, some sexual activity or sexual assault, and that the fully-tailed sperm belong to someone other than Andrews.

{¶ 32} In this case, the trial court focused on how an exclusion result would have fit into the arguments presented by the parties in 1974, finding that "[n]either the State nor the defense relied upon anything relating to sexual activity or sexual assault in this case," and that "no defense was presented that Regina had been sexually assaulted and that whoever had assaulted her was the murderer." Trial Court Opinion at 3-4. But defense counsel did posit the theory at trial that Regina was sexually assaulted by the person who murdered her. And the fact that the state did not file rape charges is explained, at least in part, by the fact that the spouse of a victim could not be charged with a crime of sexual violence in 1974.

{¶ 33} The proper focus of an outcome-determinative analysis is to consider the evidence in totality, not just the arguments made by each side at the time of trial. *See* R.C. 2953.73(D). In fact, DNA results excluding the defendant could have fundamentally changed the arguments the parties made at trial. For example, Andrews's trial counsel might have been less aggressive in pushing a sexual assault defense, perhaps fearing a jury might believe Andrews was the source of the semen. However, if counsel had known that DNA from the vaginal swabs did not match Andrews, or matched a third party via the Combined DNA Index System ("CODIS"), the entire character of the trial could have been altered. The impact of a hypothetical exculpatory DNA result should be determined independently, in the context of and upon consideration of all available admissible evidence. To the extent the trial court

relied solely on how exculpatory DNA results would have impacted the specific arguments made by the parties in 1974, its reasoning was in error.

{¶ 34} Dr. Balraj testified that the victim was stabbed 11 times, through major arteries, and would have lost a large amount of blood. The linens in which Regina's body was wrapped were completely soaked through with blood, as were her clothes. Despite this, police failed to find any blood anywhere connected to Andrews, testifying that "[n]othing that we could use against Isiah was found in the [motel] room" or in his car. The motel room where the state alleged the murder occurred was found clean and neat, with no blood or other physical evidence linking Andrews to his wife's death. Although the bedding found with the victim was completely soaked through with blood, the mattress in the Andrews's room was spotless. There was no blood on the floor or anywhere else in the room, nor was there any blood in the trunk of Andrews's car. In addition, Andrews was seen wearing the same suit both before and after the time the state alleged he murdered his wife. We further note that the linens found with the body were not unique to the Colonial Inn. In fact, they were stamped as property of multiple other hotels — "Howard Johnson Motor Inn," "Holiday Inn Akron-Canton," and "Howard Johnson, University Circle" and were from a laundry company who pooled and distributed the same kinds of linens to an unknown number of hotels.

{¶ 35} Andrews contends that DNA testing could definitively prove his innocence. It may, or it may not, but Andrews need not meet that standard to obtain testing under Ohio law. The "outcome determinative" standard no longer requires

hypothetical DNA results to be proof positive of innocence. Nor does the standard require certainty that a jury would acquit. The standard requires that there is a "strong probability" that, faced with exculpatory DNA results, a jury could find reasonable doubt as to the defendant's guilt. In this case, this means that if the sperm came from someone other than Andrews, then there is a strong probability a jury would find reasonable doubt. If DNA testing is able to match the sperm to a known felon through CODIS, there is a strong possibility a reasonable jury would have voted to acquit Andrews of his wife's murder.

{¶ 36} Our decision in *Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, is instructive. After a trial at which no physical evidence linked him to the murder of an elderly woman, Ayers was convicted of aggravated murder, aggravated robbery, and aggravated burglary. He later filed an application for DNA testing. The trial court denied his application, stating that DNA testing would not be outcome determinative. This court disagreed, finding that Ayers had made a compelling argument in support of DNA testing because the police found biological evidence on the victim and, although none of the evidence matched Ayers's DNA profile, it was possible that refinements in testing could identify the source of the DNA and perhaps establish proof that another person was with the victim at the time of the murder. *Id.* at ¶ 43. This court reasoned that the newer tests could show the existence of biological material under the victim's fingernails when testing conducted nearly ten years ago could not, and, given evidence that the victim had

wounds that indicated she tried to defend herself, a positive identification of such material would likely point to the murderer. *Id.*

{¶ 37} This court noted that Ayers had offered to bear the cost of DNA testing through non-public means, so the testing would not financially burden the state. *Id.* at ¶ 44. Moreover, this court found, if the DNA testing of the items Ayers sought to have tested yielded his expected results; that is, establishing a profile of someone who is inextricably linked to the crimes and subsequently identified – such results would undermine the confidence in the jury's verdict. *Id.*[3]

{¶ 38} Likewise, in this case there was no physical evidence linking Andrews to the murder of his wife. Andrews has also offered to bear the cost of DNA testing so the testing will not financially burden the state. Most importantly, if the DNA testing of the swabs taken from Regina during her autopsy yield the results Andrews claims they will; that is, establishing a profile of someone who is linked to the crime and subsequently identified, or if Andrews is excluded as the source of the DNA, the results would undermine the confidence in the jury's verdict. Thus, under these circumstances and the particular facts of this case, the trial court abused its discretion by denying Andrews's application for DNA testing. Accordingly, the first assignment of error is sustained.

---

[3]After the Sixth Circuit Court of Appeals granted Ayers's habeas corpus petition based on the testimony of a jailhouse informant, the state sent all of the evidence from the crime scene for DNA testing. The DNA testing excluded Ayers. In September 2011, the state dismissed its case against Ayers and he was released from prison. *See Ayers v. Hudson*, 623 F.3d 301, 304 (6th Cir.2010); *State v. Ayers*, Cuyahoga C.P. No. CR-00-388738-ZA; https://www.innocenceproject.org/cases/david-ayers (accessed Apr. 3, 2019).

{¶ 39} In his second assignment of error, Andrews argues that the court erred in denying his application for DNA testing without explaining its reasoning. Our conclusion under the first assignment of error, that the court abused its discretion in rejecting the application, renders moot the challenge advanced in his second assignment of error. *See* App.R. 12(A)(1)(c).

{¶ 40} The "ultimate objective" of our system of criminal law is that "the guilty be convicted and the innocent go free." *Ayers* at ¶ 24, citing *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). We find that the trial court abused its discretion when it rejected Andrews's application for DNA testing and reverse the court's judgment and remand the case for further proceedings.

{¶ 41} Judgment reversed and cause remanded.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

MARY EILEEN KILBANE, A.J., and
RAYMOND C. HEADEN, J., CONCUR