[Cite as *State v. King*, 2012-Ohio-4398.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97683**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# EVIN KING

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-312576

**BEFORE:** Cooney, J., Stewart, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 27, 2012

**ATTORNEYS FOR APPELLANT**

Timothy Young
Ohio Public Defender

BY: Kristopher A. Haines
Assistant Public Defender
Ohio Public Defender's Office
250 East Broad Street, Suite 1400
Columbus, Ohio 43215


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

By: T. Allan Regas
Assistant County Prosecutor
8th Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

COLLEEN CONWAY COONEY, J.:

{¶1} Defendant-appellant, Evin King ("King"), appeals the trial court's denial of his motion for postconviction relief. Finding no merit to the appeal, we affirm.

{¶2} In July 1994, King was indicted for the murder of his girlfriend Crystal Hudson ("Hudson"). The State presented circumstantial evidence to the jury on the theory that King strangled Hudson in the apartment they shared. DNA testing was performed on semen recovered from the victim, but King was not a match. King argued that the person who deposited the semen had killed Hudson. The forensic serologist testified that the semen was anywhere from 16 hours to seven days old at the time of death. When asked whether the semen was deposited contemporaneously with the victim's death, the coroner, Dr. Robert Challener, testified that it was "[v]ery unlikely to be placed at the time of death." Although fingernail scrapings were also recovered from the victim, there were no means by which to test them for DNA material in 1994. In February 1995, a jury convicted King of murder, and this court affirmed his conviction in *State v. King*, 8th Dist. No. 68726, 1996 WL 661033 (Nov. 14, 1996) ("*King I*").[1]

{¶3} In October 2004, due to advancements in DNA testing, King filed an application for DNA testing of the fingernail scrapings recovered from the victim, pursuant to R.C. 2953.72. In April 2008, the trial court granted King's application and

---

[1] Key facts stated in *King I* include that the victim was strangled, her partially decomposed body was discovered by her daughter while King was inside the apartment, and there were no signs of a struggle.

DNA testing was performed. The scrapings matched the DNA material recovered from the vaginal swabs and excluded King as a match. Based on what King felt were "exonerative DNA testing results," he filed a motion for postconviction relief in October 2010.

{¶4} A hearing on the motion was held in February 2011. In November 2011, the trial court denied King's motion, finding that when considered in the context of all available admissible evidence related to the case, the new DNA evidence did not prove by clear and convincing evidence that King was actually innocent.

{¶5} King now appeals, arguing in his sole assignment of error that the trial court abused its discretion when it denied his motion for postconviction relief.

{¶6} A postconviction relief proceeding is a collateral civil attack on a judgment, therefore, the judgment of the trial court is reviewed under the abuse of discretion standard. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77. An abuse of discretion is more than an error of law or judgment, it implies the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶7} This court, in *State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, at ¶ 19-20 (8th Dist.), explained that:

[i]n 2006, the General Assembly amended Ohio's DNA testing statutes. The amendments, among other things, made postconviction DNA testing more available to inmates and lowered the outcome-determinative standard

for establishing entitlement to DNA testing. Under the prior version of R.C. 2953.71(L), "outcome determinative" meant that had "the results of DNA testing been presented at the trial * * * and been found relevant and admissible with respect to the felony offense for which the inmate * * * is requesting the DNA testing * * * no reasonable factfinder would have found the inmate guilty of that offense."

Under the amended statute, "'outcome determinative' means that had the results of DNA testing of the subject inmate been presented at the trial * * * and been found relevant and admissible with respect to the felony offense for which the inmate * * * is requesting the DNA testing * * *, *and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case * * *,* there is a strong probability that no reasonable factfinder would have found the inmate guilty of that offense." (Emphasis added.) R.C. 2953.71(L).

{¶8} As mentioned, the trial court approved King's application for DNA testing based on this standard. In the court's April 2008 findings of facts and conclusions of law allowing the DNA testing, the court made statements such as "DNA exclusion results would eliminate King as a suspect," as the statute required. However, once the DNA results were presented to the court, the court found that the results, when reviewed with all the evidence, did not prove King's actual innocence, and therefore the court denied the postconviction relief petition.

{¶9}   King argues that the court's denial of his motion for postconviction relief was an abuse of discretion based on the statements made in the April 2008 entry granting DNA testing.   However, none of the court's statements in this interlocutory ruling[2] were binding, nor is the standard for DNA testing applications the same as the standard to be applied to postconviction petitions after the DNA results are received.

{¶10} Under R.C. 2953.23(A), a trial court may entertain a petition for postconviction relief only in limited circumstances; i.e., if a petitioner establishes one of the two following conditions:

> (1) The petitioner was either "unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief," or "the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation," and "[t]he petitioner shows by clear and convincing evidence that, but for the constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted."

> (2) The petitioner was convicted of a felony * * * and upon consideration of all available evidence related to the inmate's case * * *, and the results of the DNA testing establish, by clear and convincing evidence, actual innocence of that felony offense * * *."

{¶11} After a review of the record, we find that King did not establish either of the conditions set forth in R.C. 2953.23(A).

{¶12} "Actual innocence," under R.C. 2953.21(A)(1)(b),

---

[2]We recognize that the denial of such an application is a final appealable order that the petitioner could appeal under R.C. 2953.73(E)(2).

means that, had the results of the DNA testing * * * been presented at trial, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case * * * *no reasonable factfinder would have found the petitioner guilty of the offense* of which the petitioner was convicted * * *. (Emphasis added.)

{¶13} R.C. 2953.21(A)(1)(b) and 2953.71(L) do resemble each other, with one vital distinction. R.C. 2953.71(L) requires only a "strong probability" that no reasonable factfinder would have found the inmate guilty, where as R.C. 2953.21(A)(1)(b) requires that no reasonable factfinder would have found the petitioner guilty, without exception. Thus, the trial court's statements in the findings of fact and conclusions of law for the application for DNA testing are not binding on the court's later determination regarding the petition for postconviction relief.

{¶14} Furthermore, in denying King's petition, the trial court reviewed all of the admissible evidence before concluding that King did not establish "actual innocence." First, it reviewed the evidence submitted at trial, which this court summarized in *King I*. It then reviewed the DNA results. The court found that the DNA from the vaginal swab was consistent with the DNA from the fingernail scrapings, and that King was excluded from both specimens. However, the trial court concluded that the addition of new evidence matching the DNA from the vaginal material to the fingernail scrapings did not establish King's actual innocence.

{¶15} King argues that the sample from the victim's fingernail is evidence of a rape–murder scenario. He contends that the DNA evidence of both the fingernail scrapings and semen, as well as the coroner's testimony that there was evidence of trauma

to the victim's rectum contemporaneous to the injuries caused to her neck by strangulation, illustrates that whomever deposited the semen was the killer. King's theory ignores the serologist and coroner's testimony that although there was evidence of rectal trauma at the time of the strangulation, the semen was not deposited at the time of the murder. Thus, the fingernail scrapings support the State's theory that the victim engaged in sexual intercourse with someone other than King in the days preceding the murder. Furthermore, the evidence of rectal trauma at the time of the murder in no way exonerates King.

{¶16} In addition, we are bound by the law of the case set forth in *King I*. The law of the case doctrine provides that the decision of a reviewing court in a case remains the law of the case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels. *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). Thus, "the doctrine of law of the case precludes a litigant from attempting to rely on arguments at a retrial which were fully pursued, or available to be pursued, in a first appeal. New arguments are subject to issue preclusion, and are barred." *Hubbard ex rel. Creed v. Sauline*, 74 Ohio St.3d 402, 404-405, 1996-Ohio-174, 659 N.E.2d 781.

{¶17} Although we recognize that the doctrine of the law of the case is considered a rule of practice rather than a binding rule of substantive law, we view its application here achieves just results. The rule is "necessary to avoid endless litigation by settling the issues." *Hubbard* at 404, citing *State ex rel. Potain v. Mathews*, 59 Ohio St.3d 29, 32, 391 N.E.2d 343 (1979).

{¶18} In *King I*, this court came to the following legal conclusions: there was sufficient evidence for the jury to find King guilty of murder, and the evidence did not weight heavily against his conviction. In reaching these legal conclusions, we stated:

> When viewed in the light most favorable to the prosecution, the evidence showed that defendant was with his girlfriend, the victim, the last time she was seen alive and when her strangled decomposing corpse was discovered by her daughter. The circumstances of her death indicate she was killed from behind by someone she knew, because there were no signs of a struggle. According to the victim's friend Jean Hester, defendant and the victim had a history of fighting about cocaine and money. The victim told Hester before her death that defendant "jump on her."
>
> Defendant's behavior in the apartment before the decomposing body was discovered was curiously detached. Others noticed a foul odor, which defendant insisted resulted from cooking, but there was no evidence that anyone had cooked anything. Defendant's conduct after the victim's body was first discovered continued to be suspicious. According to Brandi, defendant began pacing and did not originally go to the closet when she told him she had discovered his missing girlfriend's body. Defendant also did not try to determine whether he could help or even whether his girlfriend was dead.

*King I* at 15-16.

{¶19} Therefore, we agree that the new DNA results do not clearly and convincingly establish King's actual innocence under R.C. 2953.23(A)(2). This evidence alone did not refute the evidence presented at trial, and therefore, King failed to establish that "no reasonable factfinder would have found [him] guilty of the offense of which [he] was convicted." R.C. 2953.23(A)(1)(b). Therefore, the trial court did not abuse its discretion when it denied King's petition for postconviction relief.

{¶20} Accordingly, the sole assignment of error is overruled.

{¶21} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
COLLEEN CONWAY COONEY, JUDGE

SEAN C. GALLAGHER, J., CONCURS (WITH SEPARATE CONCURRING OPINION ATTACHED);
MELODY J. STEWART, P.J., DISSENTS (WITH SEPARATE DISSENTING OPINION ATTACHED)

SEAN C. GALLAGHER, J., CONCURRING:

**{¶22}** I concur fully with the judgment and analysis of the majority opinion. The dissent offers a comprehensive and thoughtful analysis of the facts in the case, and I write separately to more specifically address some of the concerns raised in the dissent.

**{¶23}** Every judge wants to see justice done. No judge wants to see an innocent person in prison. Where possible, judges will engage in a search for the truth. At times, those searches, as here, do not change the outcome.

**{¶24}** There is no question that the ability to identify the origin of the fingernail scrapings through enhanced DNA testing casts new light on this case. Nevertheless, this most recent DNA test was not "outcome determinative." Upon a review of the entire record, it cannot be said that had the DNA results been analyzed in the context of and upon consideration of all available admissible evidence related to the case, there is a strong probability that no reasonable factfinder would have found King guilty. R.C. 2953.71(L).

{¶25} The victim, Chrystal Hudson, was found murdered in the closet of her sixth-floor apartment at approximately 10:30 a.m. on Wednesday, July 22, 1994. She was found by her daughter Brandi who spent the previous night with her younger sister in their grandmother's apartment on the 8th floor of the same building. The last person to see Chrystal alive, other than the killer, was her daughter Brandi, who saw her mother in the bedroom of the apartment at 11:00 a.m. on Tuesday, June 21, 1994. The only person in the apartment when Brandi and her sister arrived and discovered the body was Evin King.

{¶26} The dissent analyzes the language of the various statutes, but regardless of the definitions applied to the terms "outcome determinative" or "strong probability" under R.C. 2953.71(L) or the terms "clear and convincing" or "actual innocence" as used in R.C. 2953.21(A)(1)(a) and 2953.23(A)(2), the appellant does not establish he is entitled to relief. The DNA results do not necessarily negate the state's claim and vindicate King, nor do they establish his "actual innocence."

**{¶27}** The crucial evidence in this case has not changed or been refuted by this new DNA test. The critical evidence that remains uncontroverted is the testimony of the coroner, Dr. Robert Challener, and the coroner's serologist, Kay May. Both testified that the sperm found in the victim that did not match King was deposited anywhere from two days to seven days *prior* to her murder. Specifically, May testified that no F-30 enzymes were present in the sperm recovered, indicating that the sperm was deposited at least 16 hours *prior to the murder*. The fact that the fingernail scrapings are now shown to match the sperm originally recovered does not change those facts.

**{¶28}** The dissent presumes that by authorizing a test under R.C. 2953.71(L), results consistent with the defendant's theory must be read to exonerate the defendant as "outcome determinative." This approach would require us to ignore the other facts previously established and not refuted.

**{¶29}** Further, there is nothing in the statutory scheme that would preclude the trial court from reconsidering its decision after the results are obtained. A decision to grant an application for postconviction DNA testing brought pursuant to R.C. 2953.71 et seq. is not a final, appealable order because there is no provision for an appeal by the state. *See State v. Montgomery*, 8th Dist. No. 97143, 2012-Ohio-1640, ¶ 11-12. Instead, only a defendant whose application for DNA testing has been rejected is permitted to appeal. *Id.* at ¶ 13; R.C. 2953.73(E). It necessarily follows that a determination to allow DNA testing is not binding as to the defendant's ultimate fate.

**{¶30}** The trial court may have erroneously drafted its order to suggest that if the new test revealed King's DNA was not in the scrapings, the defendant would be granted the relief requested. The trial court was attempting to utilize new testing techniques to clear up the unidentified origin of the fingernail scrapings. While R.C. 2953.74(B) and (C) indicate the test should be approved only if it will be outcome determinative, one cannot fault the trial court for attempting to clear up an undefined factor in the case. The trial court's heart was in the right place. Regardless of the language in the trial court's order and the mandates of R.C. 2953.74, this test result changes nothing.

**{¶31}** Unless King can offer some explanation or testimony that refutes or casts doubt on the testimony of Dr. Challener and serologist Kay May, the trial court was right in denying the request for relief. Specifically, it would take a hearing with an expert or a report that can reasonably question or refute both Challener's and May's claims that the sperm was deposited *prior* to the murder, to make a more compelling argument that the origin of the fingernail scrapings is "outcome determinative" in this case.

MELODY J. STEWART, P.J., DISSENTING:

**{¶32}** Evin King theorized at trial that the person whose semen was found in the victim was also the person who killed her by ligature strangulation. He might have proved that contention at trial if then-existing testing protocols were able to test the genetic material recovered from beneath the victim's fingernails. If the DNA from the victim's fingernails matched the semen found in her, King's theory would be supported, showing that the victim would have been killed as she clawed at the murderer's hands while being strangled.

**{¶33}** Testing techniques have now been refined to the point where DNA evidence is deemed by many to be the most reliable form of evidence. Recognizing the strength of King's theory of the murder, the court granted additional DNA testing by finding that if testing showed that the genetic material recovered from the victim's fingernails did not belong to King, that result would be "outcome determinative." Yet when the DNA from the fingernails did not match King but matched the semen found in the victim, the court inexplicably denied postconviction relief, concluding that the DNA evidence "does not by clear and convincing evidence establish in the Court's mind [the] actual innocence of the Defendant."

**{¶34}** This conclusion was reached in error. The majority's decision to affirm the court requires it to engage in a flawed analysis that makes immaterial and vague distinctions between the "outcome determinative" standard for granting DNA testing under R.C. 2953.71(L) and the standard for granting postconviction relief under R.C. 2953.21(A)(1). Those standards are cut from the same cloth and, when properly applied, compel the conclusion that the court erred by refusing to grant postconviction relief. The decision of the trial court should be reversed, and Evin King should be released from prison.

**{¶35}** To obtain additional DNA testing, King had to demonstrate that the DNA evidence would be "outcome determinative." R.C. 2953.71(L) states that the results of DNA testing are outcome determinative when, "in the context of and upon consideration of all available admissible evidence related to the offender's case * * * there is a strong probability that no reasonable factfinder would have found the offender guilty" of the offense.

**{¶36}** R.C. 2953.23(A)(2) provides the vehicle for vacating convictions under the outcome determinative standard employed for DNA testing:

The petitioner was convicted of a felony, the petitioner is an offender for whom DNA testing was performed under sections 2953.71 to 2953.81 of the Revised Code or under former section 2953.82 of the Revised Code and analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code, and the results of the DNA testing establish, by clear and convincing evidence, actual innocence of that felony offense or, if the person was sentenced to death, establish, by clear and convincing evidence, actual innocence of the aggravating circumstance or circumstances the person was found guilty of committing and that is or are the basis of that sentence of death.

{¶37} As used in R.C. 2953.21(A)(1)(a), the phrase "actual innocence" means that "no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted[.]"   R.C. 2953.21(A)(1)(b).

**{¶38}** It is true that R.C. 2953.71(L) differs from R.C. 2953.21(A)(1)(b) because it requires a "strong probability" whereas R.C. 2953.21(A)(1)(b) does not use that language. But it is important to note that R.C. 2953.21(A)(1)(a) requires "clear and convincing" evidence of actual innocence, so it is proper to say that a petitioner is entitled to relief if he can show by clear and convincing evidence that no reasonable factfinder would have found him guilty. This standard is virtually identical to the outcome determinative standard in R.C. 2953.71(L) which requires "a strong probability that no reasonable factfinder would have found the offender guilty" of the offense. We held as much in *State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, ¶ 21 (8th Dist.), when we noted that "[t]he addition of the words 'strong probability,' among others, in the current version of R.C. 2953.71(L) in essence lowers the definition of 'outcome determinative' from a showing of innocence beyond a reasonable doubt to one of clear and convincing evidence."

**{¶39}** Although the majority cites *Ayers*, it does not cite it for the proposition that the "strong probability" and "clear and convincing evidence" standards are the same in meaning. The clear and convincing evidence standard of proof is "intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *State v. Eppinger*, 91 Ohio St.3d 158, 164, 743 N.E.2d 881 (2001); *see also Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Something is probable when it is more likely than not. A "probability" of something occurring is likelier than something happening by a mere preponderance of the evidence. When there is a "strong" probability of something occurring, it means it is far more likely than the preponderance of the evidence standard but something less than the kind of certitude expressed in the beyond a reasonable doubt standard. A strong probability is thus more than a preponderance of the evidence and less than beyond a reasonable doubt — in other words, functionally equivalent to the clear and convincing evidence standard. *See, e.g.,* Natalini, *Comment: Preventive Detention and Presuming Dangerousness Under The Bail Reform Act of* 1984, 134 U. Pa. L.Rev. 225 (1985), fn. 88, citing to McBaine, *Burden of Proof: Degrees of Belief*, 32 Calif. L. Rev. 242, 246-247 (1944).

**{¶40}** Once the trial court declared that the results of DNA testing would be "outcome determinative" under R.C. 2953.71(L), and those results were in fact favorable to King, the court was obligated to find that King showed "actual innocence" and should have ordered his release from prison.

{¶41} The "actual innocence" standard set forth in R.C. 2953.21(A)(1)(b) does not require King to show that he is actually innocent — that he did not commit the crime (although King has always maintained that he is indeed actually innocent) — he only needed to show that, had the fingernail DNA evidence been presented at trial and analyzed in the context of all admissible evidence related to his case, "no reasonable factfinder would have found [him] guilty of the offense of which [he] was convicted[.]" In other words, with the DNA results from the fingernail scrapings, a reasonable factfinder would, more likely than not, find that the state did not prove beyond a reasonable doubt that he committed the murder. The court engaged in this same analysis of the impact of the DNA evidence when granting the motion for DNA testing under R.C. 2953.71(L), which required the court to consider the possible results of DNA testing "in the context of and upon consideration of all available admissible evidence related to the offender's case[.]"

{¶42} King theorized that the person whose semen was found in the victim was also her murderer. In an answer on the application form that petitioners for DNA testing must complete, King was asked to state: "What defense was presented in your case at the time of your plea or trial?" King responded: "Defendant maintained that he left the victim's apartment before she was killed by an unidentified assailant. Defendant presented an alibi that he spent time with other people during the time of the killing."

**{¶43}** The application for DNA testing also asked King to "[e]xplain why a DNA test would have changed the outcome of your case. (Be specific)[.]" King explained that "[i]f the fingernail scrapings match a third party, not defendant, the indication is that victim got assailant's skin cells under fingernails during death struggle, and killer is third party perpetrator. There is no other physical evidence implicating defendant in this killing." As King stated in his memorandum in support of his application for DNA testing, "[i]f a DNA profile of the scrapings matched the semen profile, this would implicate a third party perpetrator, as an argument can be made that in the struggle with her assailant, the victim got some of her assailant's skin cells under her fingernails."

**{¶44}** In granting DNA testing, the court accepted King's stated rationale. In the findings of fact and conclusions of law issued by the court, it stated in pertinent part:

> C. **Determination whether DNA exclusion would have been outcome determinative at Trial. R.C. § 2953.74(B) and R.C. §2953.71(L)**.
>
> DNA procedures have advanced dramatically since the time of this trial. The debris from the nails examined today may yield testable biological material. This is a circumstantial evidence case. If biological material is available, it should be tested. DNA belonging to "an unknown party" found under the fingernails of the victim, for example *would prove the identity of the real killer if the fingernail debris is testable and matches the DNA from the semen*. King's theory of defense was a third party killed and raped the victim while he was away from the apartment.
>
> DNA testing results would be outcome determinative.
>
> * * *

DNA testing of the samples of the DNA collected from the victim with King's DNA samples may definitely prove that King did not murder Ms. Hudson.   If Hudson scratched her assailant, the crime scene evidence technician may have scraped the real assailant's biological material from her fingernails.   If the results of the DNA testing establish that someone other than King was the assailant, a reasonable factfinder may not find him guilty of the murder of Ms. Hudson.

\* \* \*

*If a DNA profile of the scrapings matched the semen profile, a strong argument could be made that Ms. Hudson scratched her assailant as he raped and murdered her.*

*DNA exclusion results would eliminate King as a suspect.   This Court finds that no reasonable factfinder would have found King guilty had DNA exclusion results been presented.   Thus DNA exclusion results would have been outcome determinative.*

\* \* \*

**H.   Determination whether one or more of the defense theories asserted at the trial stage was of such nature that, if DNA Testing is conducted and an exclusion result is obtained, the exclusion result will be outcome determinative.   R.C. §2953.74(C)(4).**

A trial court may accept an application for DNA testing if an exclusion result will be consistent with a defense theory presented at the trial of the case. \* \* \*   This Court adopts its reasoning in part C and finds an exclusion result will be consistent with King's alibi defense and general denial which he asserted at trial.

**I.   Determination whether, if DNA Testing is conducted and an exclusion Result is obtained, the results of the testing will be outcome determinative regarding the inmate.   R.C. §2953.74(C)(5).**

As discussed in part C of its Finding[s] of Facts and Conclusions of Law, this Court found that DNA exclusion results would have been outcome determinative. *Evidence that King was not the donor of biological evidence recovered from the fingernails of the victim would provide strong evidence of King's innocence. This Court finds that, if DNA testing is conducted and an exclusion result is obtained, the results of the testing will be outcome determinative regarding King.* (Emphasis added.)

**{¶45}** The results of the DNA testing conclusively showed that the genetic material recovered from the victim's fingernails did not belong to King, but instead matched the DNA from the semen found in the victim. This evidence is crucial because it is the exact evidence that King argued, and the court found, "will be consistent with King's alibi defense and general denial which he asserted at trial," "would provide strong evidence of King's innocence," "would eliminate King as a suspect," "would prove the identity of the real killer," and "would be outcome determinative."

**{¶46}** The DNA test results support King's contention that the male who deposited the semen in the victim is the killer, regardless of whether the semen was deposited during a rape or consensual intercourse. Evidence showed that the victim had been strangled from behind after being brutally beaten. Under those circumstances, the obvious close contact with her assailant makes debris found under her fingernails significant in and of itself, the timing of the semen deposit notwithstanding. *See* Matte, Williams, Frappier, & Newman, *Prevalence and Persistence of Foreign DNA Beneath Fingernails*, Forensic Science International: Genetics 6, (2012) 236-243. With the state admittedly building its case for murder solely on circumstantial evidence, this DNA evidence would have been compelling.

{¶47} The state argued that King and the victim knew each other, thus accounting for the lack of evidence in the apartment showing a struggle. The state thus understood at trial that it could rebut King's theory that the person who deposited the semen was also the murderer if there was no DNA evidence found beneath the victim's fingernails. It offered the testimony of a forensic scientist who testified that there was "no blood or tissue or any material significance" found under the victim's fingernails. The expert also reiterated on both direct and cross-examination that the scrapings resulted in nothing of evidentiary value.

{¶48} King's theory of who committed the crime evaporated with the expert's testimony. He had no other way to tie the person who left the semen in the victim to the murder. This meant that the state could plausibly argue that the semen and murder were unrelated happenings.

{¶49} Although the forensic evidence did not demonstrate with any certainty when the semen had been deposited, the state maintained that the semen was deposited during a remote time prior to the murder. In fact, the state went to great lengths to demonstrate that the semen was deposited as far away in time from the murder as possible. Testimony from a scientist that no biological material or that nothing of evidentiary value was found beneath the fingernails supported this strategy. Evidence that biological material was indeed located beneath the fingernails, and that the material matched the person whose semen was found in the victim certainly runs counter to the strategy. At a minimum, the factfinder would have to determine how, and when, the material got lodged beneath the fingernails.

{¶50} The DNA result excluding King as the originator of the genetic material found beneath the victim's fingernails was a crucial break in the case. It negates the forensic scientist's testimony that no biological material was found under the victim's fingernails and weakens the state's entire case of circumstantial evidence. King's contention that an unknown person's DNA material found under the victim's fingernails "would prove the identity of the real killer if the fingernail debris * * * matches the DNA from the semen because King's theory of defense, i.e. a third party killed and raped the victim while he was away from the apartment * * *," is made all the more probable with the test results than without them. The court had to have understood all of this when it granted King's application for DNA testing.

**{¶51}** Despite making the findings that "[i]f a DNA profile of the scrapings matched the semen profile, a strong argument could be made that Ms. Hudson scratched her assailant as he raped and murdered her," that an exclusion result "would eliminate King as a suspect," and that "no reasonable factfinder would have found King guilty had DNA exclusion results been presented [at trial]," the court ultimately held that the DNA evidence did not prove King's innocence. In its findings of fact and conclusions of law, the court stated that "[t]he only new evidence is that the DNA material under the fingernail was not the Defendants and that it was consistent with the vaginal DNA material." The court made no mention of its prior ruling that the DNA evidence would be outcome determinative. Instead, it justified the reversal of its prior statements concerning the impact of the DNA evidence by saying:

> The Court concludes that this particular additional information does not by clear and convincing evidence establish in the Court's mind actual innocence of the Defendant. Further, since the evidence presented at trial already excluded Defendant as the donor with respect to the vaginal swabs, the Court finds that this one additional fact would not be outcome determinative.

{¶52} Nothing about the case changed from the time when the court found that DNA testing would be outcome determinative to the time when the court denied postconviction relief. The court's statement that "[t]he only new evidence is that the DNA material under the fingernail was not the Defendants and that it was consistent with the vaginal DNA material" is perplexing. This was the exact evidence, and indeed the "only new evidence," King sought in his petition for testing. Even more, this was precisely the evidence the court had previously ruled "will be consistent with King's alibi defense and general denial which he asserted at trial," "would provide strong evidence of King's innocence," "would eliminate King as a suspect," "would prove the identity of the real killer," and "would be outcome determinative."

**{¶53}** The court's refusal to grant postconviction relief is a clear abuse of the court's discretion because the court specifically found that DNA testing *would* be outcome determinative. The court's initial outcome determinative finding was made "in the context of and upon consideration of all available admissible evidence" related to King's case. R.C. 2953.21(A)(1)(b) required the court to consider the DNA evidence presented in a petition for postconviction relief "in the context of and upon consideration of all available admissible evidence" related to King's case. In other words, the court had to view the DNA evidence in the petition for postconviction relief and the evidence at trial in the same light in which it viewed it when deciding whether DNA testing would be outcome determinative. The court concluded that King's DNA evidence did not show actual innocence, even though it found the very same evidence would be outcome determinative. Because the standards employed in R.C. 2953.71(L) and R.C. 2953.21(A)(1)(a) are functionally identical, the court's opposite conclusion on the same evidence is arbitrary, unreasonable, and capricious — the very definition of an abuse of discretion. *State v. Adams* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶54}** The state opposed the petition for postconviction relief on grounds that King was asking for a new trial based upon "unremarkable" evidence — evidence that was neither new nor contradicted by the scientific evidence presented at trial that there was no evidence of rape, no evidence of a struggle between the victim and her murderer, and no evidence that correlated the sexual relations and the deposit of sperm with the homicide. The state went on to strenuously argue that King's petition and the results of the DNA testing do nothing to alter the evidence presented at trial regarding the age of the semen found inside the victim: that evidence, the state argued, shows that there was no rape–murder. Now, the new evidence does correlate the "sexual relations" with the homicide, arguably by time, but certainly by identity. The new DNA evidence is the best, if not the sole, piece of physical evidence that ties the perpetrator to the crime.

{¶55} Additionally, the best that can be said of the state's arguments in opposing the petition for postconviction relief is that they had been rejected when offered in opposition to the motion for DNA testing. The state opposed DNA testing on grounds that DNA evidence was available and introduced at the time of trial. It also argued that additional DNA did not exist, and even if it did and could be tested, the DNA results would not be outcome determinative because they would not likely convince a reasonable juror that King did not commit the crimes for which he was convicted, "let alone create doubt where the biological material found on the victim's body in the form of spermatozoa that was tested excluded Defendant as the source." These were essentially the same arguments the state made when opposing the petition for postconviction relief and nothing changed between the time the court granted testing and then denied postconviction relief. The majority concedes the inconsistency of the trial court's decision, but nonetheless affirms the court's decision, asserting that the outcome determinative finding was not binding on the court because it was "interlocutory."

{¶56} Also, the majority's conclusion appears to be at odds with its application of the law of the case doctrine — the majority essentially finds that this court's affirmance of King's conviction on direct appeal established that there was sufficient evidence to sustain the conviction and that the new DNA evidence does nothing to contradict this. That conclusion is obviously at odds with the court's finding that the DNA evidence, if not matched to King, "would eliminate King as a suspect." There would be no point in postconviction testing for DNA if the reviewing court could waive away the results of that testing simply by pointing to the same evidence used to convict. Again, R.C. 2953.71(L) specifically requires the trial court to determine whether DNA testing will be outcome determinative by analyzing the DNA evidence "in the context of and upon consideration of all available admissible evidence related to the offender's case[.]" So to the extent the court found that the results of DNA testing would be outcome determinative, it had to view those results in the context of the evidence presented in King's case. It could not make an outcome determinative finding based on the results King set forth in his petition, and then turn around and say that those exact results would not support a finding of actual innocence. The concurring opinion attempts to explain the inconsistency merely by implying that the trial court, although well intentioned, erred in granting the petition for testing because the results were not "outcome determinative."

{¶57} To the extent that the court's consideration of the impact of the DNA evidence changed or differed from the testing stage to the results stage, that consideration cannot be based on a less comprehensive review of the evidence once the actual results were submitted. In this case, the trial court did not conduct a comprehensive review of the evidence. So the court abused its discretion also because it is clear that the court did not consider the new DNA evidence "in the context of and upon consideration of *all* available admissible evidence" as the statute requires. (Emphasis added.)

{¶58} In its findings of fact, the court gave a brief summary of the case and referenced a "broader recapitulation of the facts" that could be found in the pleadings and this court's opinion in King's direct appeal. This does not demonstrate the type of review and consideration of the evidence contemplated by the statute. Furthermore, before its conclusions of law, the court plainly states that it "has chosen to look at the new DNA results and the coroner's report." This language clearly demonstrates that the court's analysis, as does the analysis of the concurring opinion, considered the new DNA evidence only in context to the blood antigen and vaginal swab evidence presented at trial — and not even all of that evidence.

**{¶59}** Tellingly, the court states in its conclusions of law that "the findings in the coroner's report excluded the Defendant as the donor on a blood antigen basis. The new DNA report confirms that." The court goes on to say that "since the evidence presented at trial already excluded Defendant as the donor with respect to the vaginal swabs, the Court finds that this one additional fact would not be outcome determinative." This analysis implies that King petitioned the court for DNA testing simply to accumulate evidence to support the fact that the sperm deposits were not his. This was clearly not the reason for King's petition.

**{¶60}** Finally, the concurring opinion attempts to buttress the decision reached in this case by referencing a judicial desire to "search for the truth" "where possible," but concludes that the "search" here "does not change the outcome." I can only respond by saying that there is no "change" in the outcome because the "search" was extremely limited.

{¶61} Since King's conviction, the pleadings and judicial opinions regarding this case have been rife with misstatements and mischaracterizations of the evidence, and unfortunately, the concurring opinion continues to perpetuate these mistakes. For example, the pleadings and judicial opinions indicate that the victim's older daughter observed King with the victim the night before, and the morning of, her murder. Yet the transcript is replete with the daughter's testimony that King was not with her mother on those occasions: that her mother was alone, that King "wasn't there." Also, it is alleged that King did not deny killing the victim when the daughter accused him. Yet her testimony reveals that he consistently and repeatedly did so.

{¶62} The victim's daughter was the best witness the state presented at trial. She was the last person, other than the killer, to see the victim alive. She discovered her mother's body, and she was the only person to observe King's demeanor and response when the body was discovered. What is more, the daughter let it be known that she did not like King. She testified, "when I first saw him, I just didn't like him, just something — just I don't like him. * * * The way he looked, the way he dressed, because he dressed like he was a bum or came off the streets." Therefore, her testimony would appear to be the most credible of anyone's offered during trial. Her strong aversion to King shows that, any favorable testimony would not have been made for his benefit.

**{¶63}** The state insists that King's rape–murder theory is "speculation and fantasy" because the coroner testified that one would expect to see more intact sperm "if they had just been recently deposited" and he thought it was "very unlikely" that the sperm heads found were contemporaneous with the anal penetration. However, the coroner also testified that "[i]t is very difficult to give any reliable estimate," with regard to the age of the sperm heads. He further testified that the injury to the victim's rectum was a "common association of some form of sexual assault" and that the injury was done in conjunction with her neck injuries.

**{¶64}** As previously noted, the concurring opinion, like the trial court, analyzed the new DNA results solely in the context of the sperm evidence. The concurrence asserts that the "crucial evidence in this case," the testimony of the chief deputy coroner and that of the serologist, is the evidence that the new DNA results would have to refute, presumably in order for the results to be "outcome determinative." Not only is this analysis limited, it is just plain wrong.

**{¶65}** First off, it defies logic that one would not consider the identity of the person whose biological material was found under the fingernails of a strangulation victim, crucial: as if, the fact that the material matched the depositor of the semen is irrelevant because that person has, in effect, been ruled out as the killer with the finding of guilt against King. Secondly, the testimony of the deputy coroner and the serologist is not quite what the concurrence says it is.

**{¶66}** Dr. Challener did not testify that the sperm was deposited anywhere from two days to seven days prior to death. As a matter of fact, when asked was it possible that the sperm cells could have been deposited up to seven days prior to death, the doctor replied, "that would be stretching it a bit."

**{¶67}** Likewise, the serologist's testimony does not indicate that sperm was deposited at least 16 hours prior to the murder. Her testimony was that the particular protein that was not found in the swabs only lasts "between 8 and 16 hours," that it "[n]ever lasts beyond 16 hours after having been deposited." Because the biological material was collected 24 hours or more after the victim had been murdered, this testimony is not "crucial."

**{¶68}** The point the concurrence seems to want to underscore is that the testimony regarding the timing of the semen deposit contradicts King's theory that the crime was a rape–murder: that the semen was deposited at the same time the victim was killed. Without question, some of the testimony does indeed contradict King's theory. And some does not. In some instances, the evidence supports his theory or is conflicting. For instance, the victim's autopsy report indicates: "Few intact sperm and many sperm in vaginal and rectal smears." But neither King's theory nor the state's theory should be the sole focus in determining this case. A consideration of the DNA results in the context of and upon consideration of *all available admissible evidence* related to King's case is the analysis required by law.

**{¶69}** Last but not least, the concurring opinion also emphasizes the fact that King was the only person in the apartment (the linchpin of the state's case) when the victim's daughter discovered her body — the day after the murder. This fact is important. But again, it cannot be considered in isolation. Presence at a crime scene when a body is discovered does not automatically equate to having committed murder. King was watching television in the living room of the apartment when the body was discovered stuffed in a bedroom closet. King was also in the apartment entertaining the victim's mother and a neighbor the evening before the body was discovered, but clearly after Ms. Hudson had been murdered.

**{¶70}** The trial testimony in this case is critical, especially the daughter's testimony. Not only does she establish the time frame for her mother's death, her testimony also includes the fact that her mother always left her door open with a block, thus showing one way that someone else would have access to the apartment. All told, this evidence and more should have been considered in light of the DNA results. It was not.

{¶71} King was sentenced to 15 years to life in prison for a crime he has always maintained he did not commit. In consideration of the fact that no physical evidence connects him to this brutal murder, and no direct testimony credibly implicates him, the circumstantial evidence presented at trial cannot overcome a finding of actual innocence in light of the new DNA test results. The trial court recognized this when it granted the petition for DNA testing, but abused its discretion when it subsequently denied King postconviction relief.

{¶72} I am well aware that "a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *State v. Gondor*, 112 Ohio St.3d 377, 390, 2006-Ohio-6679, 860 N.E.2d 77. However, the trial court's finding in this matter is not. I therefore dissent from the decision to affirm.